IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| WING CENTRAL'S ROADHOUSE GRILL, INC. AND WC ROADHOUSE LLC, | ) ) ) ) | No. 33719-7-III |
| Respondents, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| ALFRED W. BUCHELI, | ) ) ) | |
| Appellant. | ) | |

FEARING, C.J. — Appellant Alfred Bucheli appeals from the trial court's grant of

summary judgment to his tenants. The judgment demanded, among other things, that

Bucheli sell restaurant property to the latest tenant. We affirm the trial court.

## FACTS

This appeal arises from a dispute between landlord Alfred Bucheli and tenants

Wings Central's Roadhouse Grill Inc. (Roadhouse Grill) and WC Roadhouse LLC

(Roadhouse LLC) (collectively "tenants"). Because the trial court resolved the dispute

on summary judgment, we take our facts from the parties' declarations in support of and in opposition to the tenants' summary judgment motion and Alfred Bucheli's deposition testimony.

Appellant Alfred Bucheli has been a butcher for sixty-eight years. Bucheli has owned Matterhorn Meats & Sausages (Matterhorn Meats) for fifty years. In January 2002, Bucheli purchased the land, building, and a defunct restaurant located at 101 West Umptanum Road in Ellensburg, near Interstate 90. The premises had previously housed a Red Robin restaurant and a safari-theme restaurant. Bucheli reopened the restaurant and operated it under the name "Matterhorn Inn" from 2002 to 2007. Clerk's Papers (CP) at 209, 421. Bucheli closed the restaurant in 2007.

During Alfred Bucheli's operation of the Matterhorn Inn, Bucheli's butcher shop, Matterhorn Meats, sold meat to the Inn. Bucheli did not have Matterhorn Meats label those meats, nor did Matterhorn Meats subject itself to United States Department of Agriculture (USDA) inspection of the meat. Bucheli considered the transactions between his two operations exempt from regulations since the restaurant was an extension of the butcher shop.

Through various companies, respondents Shannon and James Rowe own several restaurants in Kittitas and Yakima Counties. Those restaurants include Ellensburg restaurant Wing Central, near the Central Washington University campus, and Wing Central's Roadhouse Grill, at the Umptanum Road address. The latter restaurant is the

2

subject of this appeal. At a time that the Rowes already operated Wing Central, James heard about the closure of the Matterhorn Inn and approached Alfred Bucheli for the purpose of leasing the land and building. Rowe offered Alfred Bucheli a ten percent partnership share in the restaurant. Bucheli declined the offer because he did not trust Rowe. The two continued to negotiate, nonetheless.

During negotiations, Alfred Bucheli told James Rowe that Bucheli would not lease to Rowe unless Rowe purchased meat from Matterhorn Meats. Rowe concurred that his restaurant would be an outlet for Matterhorn Meats' meat. Rowe commented that Bucheli would be similar to an in-house butcher.

On May 18, 2007, Roadhouse LLC, as tenant, entered a three-year lease with Alfred Bucheli, as landlord, for the Umptanum Road property and restaurant. Shannon Rowe solely owns Roadhouse LLC. Her father gave the couple the funds to open the Ellensburg restaurants.

The 2007 lease granted Roadhouse LLC the right to renew the lease for two additional three-year terms or exercise an option to purchase the property at any time by written notice. The critical provision in the lease for purposes of this appeal required Roadhouse LLC to purchase its meat from Bucheli. The paragraph reads:

> 5. MEAT PRODUCTS: Tenant agrees to purchase at competitive rates all meat products from Lessor (d/b/a Matterhorn Meats) so long as they are available through Lessor, or Tenant shall pay Lessor a 20 [percent] surcharge of available meat products purchased elsewhere.

3

CP at 22.

Other important provisions of the lease follow. Paragraph 4 declares:

4. <u>PERSONAL PROPERTY</u>: Included with this lease is the equipment and personalty described in Exhibit B hereto. Tenant shall maintain the same in good repair and replace as needed with equipment, and other personalty including tables, chairs, food service settings and as good cooking utensils with replacements of as good or better quality.

CP at 22. Paragraph 7 reads:

7. <u>UPKEEP AND REPAIRS</u>: Tenant agrees during the term of this Lease to make all reasonably necessary repairs and maintenance to the roof, exterior of the building (including glass) and the parking lot and all other repairs, paint, upkeep and maintenance necessary to keep the improvements upon the subject leased premises in as good a condition as at the commencement of the term hereof, reasonable and ordinary wear and tear only excepted, as well as all repairs necessary to allow Tenant to conduct its business. It is intended hereby that all repairs and maintenance of whatever kind, including but not limited to plumbing, heating, wiring, interior, glass, air conditioning, etc., of the subject leased premises shall be the sole obligation of the Tenant and Tenant agrees to perform all of the same promptly as necessary and in a good and workmanlike manner. Tenant shall maintain landscaping and Tenant shall do parking striping as needed. Tenant further agrees to keep the leased premises and the areas adjacent thereto, the parking areas, and adjacent sidewalks and other areas of the total premises in a good, safe, healthy, and tenantable condition, free from debris, weeds, ice and snow, and slightly in appearance at all times.

CP at 23-24. Paragraph 11 states:

11. <u>REMODELING AND ALTERATIONS</u>: The Tenant shall have no right to make any alterations, changes or additions to said premises without first securing the written consent of the Lessor. *Signage which shall comply with all building codes shall not require consent.* All additions, changes, improvements and repairs of whatsoever kind and nature made to or upon the premises by the Tenant shall become the property of the Lessor at the termination hereof, without liability on its part

4

> to pay for the same, except that any trade fixtures, shelving, counters or other appliances placed in said premises by the Tenant which do not actually become a part of the premises by being attached thereto, may be moved by the Tenant during the term hereby created, or any extension thereof.

CP at 25-26 (emphasis added).

Alfred Bucheli testified, in his declaration, that he expected James and Shannon Rowe to use the Matterhorn Inn name for the restaurant and to use the Matterhorn Inn outside sign. An earlier draft of the lease required Roadhouse LLC to use the Matterhorn Inn sign. Although he read the final draft of the lease agreement, Bucheli did not notice a change in the language that allowed Roadhouse LLC to alter the signage without his consent.

Paragraph 23 of the 2007 lease agreement declares:

> 23. <u>OPTION TO PURCHASE</u>: Provided that Tenant is not in default Tenant shall have the option to purchase the leased premises, together with all improvements situated thereon and all equipment, fixtures and personalty that is the subject of this lease, for the sum of $1,300,000.00 payable in cash upon closing. If the option is exercised during a renewal term, the option price shall be increased by the amount of the rent consumer price index increase as described above for said term over the ending rent for the original term.

CP at 31. Alfred Bucheli did not wish to grant an option to purchase without the requirement that Roadhouse LLC purchase meats from him. Roadhouse LLC and the Rowes would not have entered the lease without the right to purchase the restaurant property.

5

Paragraph 18 of the lease provides:

18. ATTORNEY FEES: Each party agrees that in the event it becomes necessary to employ an attorney to collect any of the rent agreed to be paid or to enforce performance of any of the provisions of this Lease, all court costs and reasonable attorney's fees of the prevailing party shall be paid by the non-prevailing party.

CP at 29. Finally, exhibit B of the lease agreement between Bucheli and Roadhouse LLC addressed the inventory purchased at the time of the sale. The exhibit states:

Inventory that tenant accepts as useable inventory including soft drinks, alcohol products, saleable items, frozen meat products, unopened supplies, shall be inventoried at cost and paid at the time of possession.

CP at 167. James and Shannon Rowe personally guaranteed the obligations of the tenant under the 2007 lease.

Early in his deposition, Alfred Bucheli testified that he told James Rowe not to change the name of the restaurant from the Matterhorn Inn. Bucheli did not identify, during the testimony, when or where he uttered this remark to Rowe. Later in his deposition, Bucheli testified he could not recall if he commented that a name change in the restaurant would require United States Department of Agriculture inspections of meat sold to the restaurant.

According to the declaration of Alfred Bucheli, during negotiations leading to the execution of the lease agreement, James Rowe and Alfred Bucheli did not discuss the type of meat that Matterhorn Meats would deliver to the restaurant. James Rowe asked no questions about the labeling of meat. Later in his declaration, Bucheli testified that,

during discussions, he told Rowe that he supplied his restaurant select cuts, because they were leaner.

Upon entry of the lease agreement, James and Shannon Rowe lacked knowledge that the USDA did not inspect Alfred Bucheli's butcher shop or that the USDA imposed "substantial restrictions" on Bucheli's sale of meat. CP at 291. According to Alfred Bucheli, he was not required to label meat sold to the Roadhouse Grill restaurant since he possessed a food license and the restaurant also had a food license. Bucheli never labeled meats sold to retail customers. He never had a label machine. According to Alfred Bucheli, an unidentified agent of the USDA, in 1973, told him he needed no government inspection of his meat. Bucheli believed that his sale of unlabeled meats to the Roadhouse Grill was exempt from USDA regulation, particularly since the USDA never issued him a citation for selling meat to any restaurant.

On May 18, 2007, James and Shannon Rowe, through Roadhouse LLC, took possession of the Umptanum Road premises and opened the Wing Central's Roadhouse Grill. The Rowes borrowed from and added to the name of their preexisting restaurant, Wing Central, in order to attract Wing Central's clientele.

Upon taking possession of the restaurant, James and Shannon Rowe thoroughly cleaned the entire premises. The couple replaced parking lot light bulbs, repaired parking lot cracks, repainted parking lot stripes, mended leaks in outdoor sprinklers, replaced dead landscaping, changed the outdoor and open sign, changed office computers, fixed

7

leaky faucets, toilets and urinals, fixed water damage on the building's west wall, scoured the bathrooms, supplanted a broken hinge on a cooler door, replaced the cooling system for the coolers, substituted windows, rewired electronics, exchanged a broken garbage disposal, changed air conditioning filters, replaced the fryer, stove and oven, renovated a steam kettle, serviced the hood vent, degreased the kitchen, scoured restaurant brass, cleansed beer lines, cleaned and replaced sections of carpet, reupholstered booths, replaced broken televisions with new flat screen televisions, swapped table lighting, and substituted all tableware, pots and pans. Degreasing the kitchen required the service of three people over two days.

The Rowes changed the Roadhouse Grill booth upholstery to mimic the upholstery at Wing Central. When Roadhouse LLC assumed possession of the restaurant, a safari theme upholstery covered most booths and a camping and fishing themed upholstery covered two booths. The limited liability company did not value the mismatched and torn booth upholstery.

According to Alfred Bucheli, James and Shannon Rowe need not have engaged in any repairs or alterations since the restaurant facility was in good shape. Alfred Bucheli complains that Wing Central, without his consent, changed the upholstery in the booths and recarpeted the bar. He agrees that the recarpeted area included a path to the bar under a greasy kitchen floor. Bucheli denies that some of the upholstery was worn.

Bucheli believes the restaurant looks worse now than when he operated the Matterhorn Inn.

On June 5, 2007, Alfred Bucheli delivered a handwritten note to James and Shannon Rowe at the restaurant premises. The note read:

> I want in writing every change you are planning to make for this facility. After perusing this I will either give my okay or inform you of the changes you can make.
> Please have this ready for me by Wednesday at 5:00 pm the 6th day of June, 2007.

CP at 190. Bucheli then met with the Rowes for one hour at the restaurant. James informed Bucheli of the need for the restaurant name change and the replacement of the upholstery and some of the carpeting. Bucheli expressed displeasure at the name change, but James showed him the lease section allowing the change without Bucheli's consent. Bucheli did not then claim that Roadhouse LLC violated the lease. James Rowe believed that the carpet and upholstery modifications were needed for a successful restaurant, that Roadhouse LLC was obligated to perform these changes under paragraph 7 of the lease, and that the alterations did not require Bucheli's consent.

Shortly after Roadhouse LLC opened the Roadhouse Grill, James Rowe and Alfred Bucheli began quarreling about the meat and poultry that Matterhorn Meats delivered to the restaurant. The USDA certifies three grades of meat: prime, choice, and select. Prime beef comes from young, well-fed beef cattle and possesses abundant marbling or various amounts of intramuscular fat interspersed with lean meat. Prime cuts

9

are generally sold in restaurants and hotels. Choice beef is high quality, but has less marbling than prime. Select beef is uniform in quality and normally leaner than the higher grades. Select cuts are tender, but, because the cuts contain less marbling, the cuts lack some of the juiciness and flavor of the higher grades. James Rowe directed Bucheli to deliver choice meat. Bucheli insisted there was no difference between select and choice meat, except for fat. When Rowe ordered choice meat, Bucheli delivered select meat.

James Rowe also complained about meat, other than beef, delivered by Matterhorn Meats. Rowe complained that the bacon was too salty. According to Rowe, Bucheli delivered meat and poultry never ordered, supplied unidentifiable meat, provided inferior quality meat, and inexplicably left meat in a pan of oil. Roadhouse Grill customers criticized the quality of the meat. One customer grumbled that the turkey tasted like ham. Bucheli claims that the Roadhouse Grill is the only customer ever to complain about his meat and that the Roadhouse Grill complained only to fabricate an excuse to buy meat from another butcher.

Under the lease agreement, Roadhouse LLC needed to purchase meat from Alfred Bucheli at competitive rates. According to James Rowe, he repeatedly asked Alfred Bucheli for his price list of meat, but Bucheli produced no list. According to Bucheli, he gave Rowe his price lists.

10

Exhibit B to the lease agreement lacked a list of inventory present at the restaurant at the time that Roadhouse LLC took possession of the premises. Nevertheless, Roadhouse LLC was to pay for the inventory upon taking possession. According to Alfred Bucheli, he demanded an inventory and payment immediately upon Roadhouse LLC possessing the restaurant. James Rowe responded that the couple was too busy to conduct an inventory.

According to James Rowe, when cleaning the restaurant, the Rowes noted that much of the inventory was old, unlabeled, and undated. Rowe discovered that one of the coolers ran at a temperature above 40 degrees and concluded that food stored in that cooler could not be sold to customers. Bucheli testified that all of the inventory left on the premises was usable. In August 2007, Alfred Bucheli presented a list of inventory he claimed the limited liability company could have used in June and for which the company should pay.

On September 21, 2007, Alfred Bucheli's lawyer sent Shannon Rowe a letter notifying Roadhouse LLC that it was in default for not paying for the inventory purchased. The letter claimed the cost of the inventory to be $4,083.31. The letter also asserted that the limited liability company had not purchased all of its meat requirements from Bucheli and demanded invoices of meat purchased by the company from other sources. The attorney's letter made no mention of a default for failure to obtain Bucheli's written consent for the upholstery or carpet replacement.

11

In response to Alfred Bucheli's lawyer's notice to cure the default, James Rowe reviewed Bucheli's list of inventory and marked the items he deemed unusable. Roadhouse LLC had already paid $125.86 for the inventory. Rowe concluded that Roadhouse LLC owed another $1,526.75 for the inventory. Roadhouse LLC, then paid this sum and its attorney, on September 25, forwarded a check for this amount to Alfred Bucheli's lawyer. Bucheli never cashed the check.

Roadhouse LLC, attorney's September 25 letter added, in part:

> Regarding meat products, my clients are running a different kind of restaurant than was run by your client. Certain meat products such as "bone in" products, such as rib eyes, T-bones, etc. are not available from your client. My clients serve certain high end products that your client does not have or does not have at competitive prices. My clients need a list of all meat products that your client has available for sale, the price he is willing to sell to my clients, and the source of the product. We might add that my clients purchased about $400.00 worth of smoked turkey product, which was unusable because of customer complaints. The products must be available and competitive.
>
> . . . .
> I can assure you that my clients are working very hard to make their restaurant work. Now that we have established contact it is hoped that we work amicably to resolve any issues that Mr. Bucheli has without receiving default letters. I can assure that my clients intend to honor their lease commitments at every level. We hope that Mr. Bucheli does not begrudge our clients efforts to change the nature of the restaurant to a more successful establishment than has previously survived at that location in the past with previous owners. It helped that they already had a successful establishment called Wing Central near the university to build upon. We look forward to working with you.

CP at 418-19.

On October 16, 2007, Roadhouse LLC assigned its tenant rights under the lease

agreement to Roadhouse Grill Inc., also owned solely by Shannon Rowe. The Rowes wanted the restaurant's ownership name to coincide with the restaurant's name.

At an unidentified date, James Rowe learned that Alfred Bucheli may be unlawfully delivering meat to the Roadhouse Grill. None of the meat came with product information labels or safe handling labels. The bacon and ham had not been inspected by the USDA. Roadhouse Grill ceased purchasing meat from Bucheli.

On March 10, 2008, Alfred Bucheli wrote, in part, to James Rowe:

> Paragraph 5 of the lease of the restaurant says you are to buy your meats from Matterhorn Meats or pay a surcharge. About September 15, 2007, you stopped ordering meat from the Matterhorn. As landlord I am therefore entitled to a surcharge of 20 [percent] of all your expenses for meat products I provide.
> I looked back at my records for 2006. My 12 month average meat bill was $2850. The surcharge would be $570 per month. If you do not wish to order your meat from the Matterhorn, I would propose the rent for the balance of the lease term be increased by $500 per month and that paragraph 5 could be dropped.

CP at 413.

On March 22, 2008, James Rowe wrote to Alfred Bucheli:

> I received your letter dated March 17, 2008 in which you discussed paragraph 5 of the lease.
> As discussed before with your attorney Mr. Andreotti, we are running a different type of restaurant than was run at this location in the past. We have certain meat products on our menu such as "bone in" rib steaks, prime grade baseball cut top sirloins, center cut New York steaks and other such things that were not available from Matterhorn Meats. We have very high standards and hold our current suppliers to stringent inspections. All meats are custom packed for freshness and quality. We had some problems with the quality we received from Matterhorn Meats in

13

the past. With that said we also discussed a list of meat products that were available for sale from Matterhorn Meats, the price and the source of the product. We discussed this in our letter dated September 25, 2007 and have had no response until March of 2008. The 20 [percent] surcharge is only for meat that you could supply at a competitive price that was purchased from other vendors. Without a price list and item list we were unable to purchase during this time. Our lawyer says for liability purposes, we must use only products that are USDA approved or are legally exempt from USDA inspection. We also must follow all Health Department and food handling guidelines as well and were unsure if those or the USDA standards could be met with Matterhorn Meats selling to a restaurant as opposed to a over the counter customer.

I am open to discussion about dropping paragraph 5 from the lease as this seems to have caused a problem between us in favor of some alternative satisfactory to both of us.

We would also like at this time to get written consent for some improvements to the building as outlined in paragraph 11, all of which would enhance the building and make the building an even better security than it now is. We would like to build an outside seating area for our guests in the form of a patio. This would be constructed with all the necessary permits. We feel this would only add to the value of your building as it would expand the seating. We would also like to do some re decorating in the restaurant such as adding new wall coverings, re covering [sic] all the booths, new carpet, floor tiles and upgrade the wall coverings to fit the concept of the current business. All of these changes would be done with very high quality products and by licensed contractors. We hope you see the benefit of these changes and will respond to us in a timely manner.

You also sent receipt for insurance. We need to contact the insurance company and get a copy of the policy as the receipt does not give many details. When that is cleared up payment will be sent. This will also be done in a timely manner [by] us.

We wish to give you some good news. We expect to meet the gross sale goal of $360,000 and will be increasing the rent according to our lease by $1,000 commencing in July. Let us know when we can get together to obtain your approval on the alternations and to negotiate your concerns with paragraph 5.

CP at 205. According to Alfred Bucheli, there is no such thing as "bone-in" rib eye. CP

14

at 327.

Alfred Bucheli claims Roadhouse Grill ceased purchasing meats from Matterhorn Meats around September 15, 2007, but that James Rowe did not complain about any USDA violation until 2011. Rowe's March 2008 letter mentioned the need to follow USDA regulations.

Alfred Bucheli responded on April 23, 2008. He wrote:

> Paragraph 5 is because I bought the restaurant not for an investment instea[d] as an outlet for the meat shop. I told you this repeatedly. But since you have decided not to buy meat from me therefor I am forced to charge you 20 [percent] surcharge. For the last three years my meat sales were:
>
> | 2004 | $42,836.50 | / 2005 | $40,030.50 | / 2006 | $33,708.10 |
> |---|---|---|---|---|---|
> | Average | $3,569.71 | / | $3,335.88 | / | $2,809.01 |
> | 20% = | $713.94 | / | $667.18 | / | $561.80 |
>
> that comes to monthly payments of $647.64
> (For your information in my entire life I had never shortchanged anyone knowingly.)

CP at 42.

On July 30, 2008, Alfred Bucheli's attorney wrote, in part:

> Dear Mr. Rowe:
>
> . . . .
> Mr. Bucheli showed us a copy of his letter to you dated March 17, 2008. He has proposed increasing the rent $570 per month in exchange for eliminating the obligations of paragraph 5 retroactive to October 1, 2007. If that is satisfactory, sign and return the enclosed copy of this letter. If that is not satisfactory, and if we cannot resolve this matter, we will need to give a notice of default under the lease.
> When Mr. Bucheli agreed to lease the restaurant, sale of meat products was a significant and valuable motivation. He is not willing to delay resolution of this matter further.

CP at 416.

On August 11, 2008, Alfred Bucheli's attorney wrote another letter to James Rowe. The attorney's letter read:

Apparently the letter to which you referred is an undated letter from March 2008 to Mr. Bucheli signed by you. I am told you have been provided with a price list and item list. Prior to signing the lease you were informed that if the name of the Matterhorn Restaurant were changed, it would no longer be an extension of Matterhorn Meats and that could cause a USDA inspection problem. You chose to change the name anyway so the inspection hurdle is not the landlord's problem. As to those items that you are unable to purchase and serve as contemplated in the lease, your only option is to pay the 20 [percent] surcharge. Please provide us a list of your meat purchases so we may agree on the amount of the 20 [percent] surcharge called for in the lease.

CP at 184. During his deposition, Alfred Bucheli testified about the letter:

Q. (Mr. Dunham) So I want to go back to this, and I want you to look at the third sentence there, starts with "prior."
A. Okay.
Q. And he says in the letter:
"Prior to signing the lease, you were informed that if the name of the Matterhorn Restaurant were changed, it would no longer be an extension of Matterhorn Meats, and that could cause a USDA inspection problem."
Do you agree with that statement of your lawyer?
A. I think it was a speculation from my attorney.
Q. So he didn't get that from you?
A. No.
Q. So you had no comment about whether the name change would have an impact on inspections?
A. I cannot recall that anymore.
Q. So you don't recall telling—this says, "prior to signing the lease, you were informed." And I assume what he's saying is that you, Mr. Bucheli, informed Mr. Rowe.
MR. MONTOYA: Objection. Calls for speculation.

16

Q. (Mr. Dunham) Do you know?
A. No.
Q. So you have no idea where that statement came from?
A. No.
Q. And you don't stand by that statement?
A. No.
Q. You disagree with it?
A. Yes.

CP at 235-36, 292. Roadhouse Grill Inc. ignored the demand and never paid a surcharge to Bucheli.

On October 1, 2009, Roadhouse Grill Inc. notified Alfred Bucheli of its intent to exercise the option to renew the lease for another three years. On March 19, 2010, Alfred Bucheli's attorney acknowledged receipt by Bucheli of the October 1 notice to exercise the option to purchase. The lawyer's letter stated that the Roadhouse Grill was in default for buying meat from sources other than Bucheli. The letter made no mention of a failure to pay the entire sum for the inventory or a failure to obtain written consent for improvements.

On March 30, 2010, Roadhouse Grill Inc.'s lawyer replied, in part:

We are in receipt of your letter of March 19, 2010, addressed to Shannon R. Leahy [Rowe]. . . . As you know, we fully responded to your client's claim that the Roadhouse Grill was in default of paragraph 5 of the lease in part for not purchasing Meat Products by certified letter dated September 25, 2007. We advised you then that certain meat products such as "bone in" products, like rib eyes, T-bones, etc were not available from your client. Paragraph 5 requires that [Matterhorn Meats] offer meat products at competitive prices. In our letter of September 25, 2007, our client asked for a list of all meat products that your client had available for sale, the price he is willing to sell to my client, and the source of the

product. My client never received a response to this reasonable request. To claim, the Roadhouse Grill is in default almost three years later and still no price list raises issues of waiver and estoppel.

Further what we did not put in the letter but spoke to you about before our letter of September 25th was the requirement that your client had to have USDA certification to sell wholesale to restaurants. The inspections for selling over the counter retail butcher products do not qualify. The meat sold to the Roadhouse Grill must have [ ] certification on the packages. Although we did not put in the letter then out of deference to your client, our position then and now is that we do not believe that your client was able to legally sell his meat to the Roadhouse Grill or any other restaurant.

We have advised our client that she is not in default under the lease and that her option to renew is valid. This leaves two legal options. She will simply go forward and operate the business under the renewal terms and wait to see if your client is fool hardy enough to risk substantial attorney fees [and costs] or we bring a declaratory judgment action right now to have a superior court judge rule that your client's position is frivolous, again requesting attorney's fees against your client. Of course, we would seek discovery regarding your client's USDA's practices and certifications.

We assume that [Alfred Bucheli] is using this claim of default as a subterfuge to see if he can extort any further rent from the Roadhouse Grill. With that in mind, my client is willing to pay $500.00 for two lease modifications to prevent further extortions. First, my client requests that Paragraph 5 (Meat Products) be deleted in its entirely, and second, the first sentence only of Paragraph 11 (Remodeling and Alterations), the requirement that tenant must obtain landlord's written consent to make improvements be deleted. We believe these deletions will prevent further extortions. The Roadhouse Grill will begin paying $500 additional rent effective April 1, 2010 for this lease modification.

If money and liquidity is an issue[,] . . . the Roadhouse Grill has another proposal. It will agree to exercise it[s] option to purchase pursuant to paragraph 23 under the following terms: seller to carry a note and DOT. The $1,300,000 lease contract purchase price will be amortized over 25 years at 7 [percent] simple interest, which would mean a monthly payment of $9,188.14 per month. This sale is conditioned upon seller being able to provide marketable title, free and clear of encumbrances. It would seem a seller financed sale at this time might be favorable to your client as it would

mean that not all of the $9,188.14 would be taxable as his current rent is. A portion would be a non-taxable return on capital, a portion would be taxable interest, and the remaining portion would be taxable at the favorable capital gains rate.

If neither of these proposals are acceptable to your client, please advise immediately and we will discuss with our client the advisability of bringing a declaratory judgment action to declare your client's position to be frivolous and to enforce the exercise of tenant's option to renew.

Time is of the essence. We need your client to make a decision on either of these proposals sooner than later. Please advise at your earliest convenience.

CP at 410-11.

Roadhouse Grill Inc. sent another offer to purchase the property, and, despite the alleged default, the parties negotiated toward a purchase of the property until August 2010. After Bucheli acquired new counsel, the parties resumed negotiations from February 2011 until June 2011. James and Shannon Rowe, Alfred Bucheli, and their respective attorneys met at Matterhorn Meats on June 24, 2011. During the meeting, Bucheli showed a large plastic construction bin on wheels that contained much of the inventory unaccepted by Roadhouse Grill. Fortunately, no one describes the condition of the meat after four years. According to James Rowe, he then offered to pay an additional sum Bucheli claimed was due him. Bucheli denies that the Rowes asked him for a figure. Bucheli presented no monetary figure.

During the June 24, 2011, meeting, James Rowe asked Alfred Bucheli for written consent to construct a concrete patio for outside seating. Bucheli ignored the request.

19

During his deposition, Bucheli stated that, because he was "short changed," he would "short change" the Rowes. CP at 291.

On March 7, 2012, Roadhouse Grill Inc.'s attorney sent a check for $1,000 to Alfred Bucheli's attorney for additional payment of the inventory. In July 2012, after several years of failed negotiations, Bucheli again asserted that Roadhouse Grill Inc. was in default. He declared that he had no obligation to sell the restaurant premises. He refused to sell. Bucheli argued that Roadhouse Grill Inc. defaulted on the lease by failing to pay for inventory, refusing to purchase meat from Matterhorn Meats, and engaging in unauthorized repairs and modifications to the premises.

On May 22, 2013, Roadhouse Grill Inc. sent a third notice to Alfred Bucheli to exercise its option to buy the leased property for $1,377,740. On January 22, 2015, after Alfred Bucheli's deposition, Bucheli's lawyer wrote to Roadhouse Grill Inc.'s attorney about the uncashed check from April 2012:

> My client told me to return the check to you in April 2012, but because of personal family issues arising at the time, I was busy and the check was not sent.

CP at 257.

The tenants have never been late in a lease payment. According to Alfred Bucheli, Matterhorn Meats has lost about $2,000 per month in revenue as a result of Roadhouse Grill not purchasing meats from it.

20

PROCEDURE

On August 29, 2012, the tenants sued Alfred Bucheli and requested a declaratory order that they were not in default under the parties' lease agreement and thus able to exercise the option to purchase. Bucheli counterclaimed and contended that the tenants breached the lease by failing to purchase meat from him, by making unauthorized improvements to the premises, and by failing to pay for inventory. Bucheli asked the court to declare the tenants to be in default of the lease, declare that the tenants have no right to exercise the option to purchase, declare Roadhouse Grill Inc. to be a holdover tenant, and evict Roadhouse Grill Inc. from the premises. Bucheli also asked the trial court to declare whether any federal or state law prevents him from selling meat to the Roadhouse Grill.

In the alternative, Alfred Bucheli asked the court to reform or void the 2007 lease on the ground of mutual mistake. Bucheli alleged that he and his tenants were mistaken as to his ability to sell meat and that paragraph 5 of the lease was a basic assumption and material part of the lease. Finally, Alfred Bucheli asked for restitution as a result of a reformation of the lease. Bucheli added James and Shannon Rowe as counterclaim defendants.

On May 22, 2013, Roadhouse Grill Inc. sent a fourth notice to exercise its option to purchase the property for a price of $1,377,740. Bucheli refused to proceed with

21

escrow and the closing of the sale. On August 16, 2013, the tenants amended their complaint to add a request for specific performance of the option to purchase.

The tenants deposed Alfred Bucheli. During his deposition, Bucheli declared that he was exempt, as a custom butcher, from USDA labeling regulations. Bucheli averred that Roadhouse Grill could legally purchase meat from him without USDA labeling.

The tenants moved for summary judgment on their claims and for dismissal of Alfred Bucheli's counterclaims. In their motion, the tenants introduced a declaration by Robert Leifert, a retired USDA compliance investigator. The declaration read, in part:

> 6. There are generally two types of labels that are required by the USDA to be placed on meat products. Being an exempt or retail butcher does not exempt the butcher from these labeling requirements. To fail to label meat products when be[ing] sold is called "misbranding" and the meat processor selling meat products without labels is subject to criminal prosecution as is the customer who sells the same unlabeled products to his or her restaurant patrons. In addition, the meat products require safe handling labels. An example of the type of labels need[ed] to sell meat products are contained in Exhibit 21 of Mr. Bucheli's deposition, which is attached and incorporated herein. The only difference in this label and the ones Mr. Bucheli should have issued is that Mr. Bucheli's meat products would not have to put the wording showing an "establishment number["] and that the meat was "US INSPECTED AND PASSED BY DEPARTMENT OF AGRICULTURE" with one notable exception, Mr. Bucheli testified in his deposition that the bacon he processes is cured and that Cajun (sausage) and ham products were cooked. By regulation, Mr. Bucheli cannot sell "cured, cooked, or smoked" meat products to hotels, restaurants and institutions as an exempt retail butcher. In other words, these products must be USDA inspected to be sold the way they were sold to the Roadhouse. Uninspected meat products subject to mandatory USDA inspection which are being offered for sale or sold are considered "adulterated." (One of the cautionary reasons for product labels is allergies. Apparently, Mr. Bucheli sold a sausage product called Cajun to the

22

Roadhouse. It had no ingredient label on it to allow the Roadhouse to advise food sensitive customers.)

6. [sic] Mr. Bucheli testified that he did not have to put any label on his meat products, he did not have a labeling machine, he never puts labels on any of his meat products, that he was not required to put labels on the meat delivered as shown on Exhibit 15 and that he was not required to put labels on his meat products "even today." I do not know how to explain it any simpler than this: had the Roadhouse continued to purchase these unlabeled and uninspected meat products, it would have been purchasing adulterated and misbranded meat products. Had a FSIS [USDA Food Safety and Inspection Service] inspector been apprised, the meat would have been seized and been subject to a forfeiture order. If the Roadhouse had continued with this knowledge, it would have been subject to criminal prosecution under 21 USC 610. The investigation would have continued to the seller Mr. Bucheli, and if he continued to sell such products under a claim of ignorance of the law, he would have been subject to criminal prosecution. The overall goal is not criminal prosecution but to insure the public that the meat products that they are consuming is safe. To process and sell meat in the manner that Mr. Bucheli has testified in his deposition is in violation of FMIA [Federal Meat Inspection Act] and by definition not safe.

7. It should be noted that had Mr. Bucheli made application for an establishment number (an example of an establishment number is shown on the product label in Exhibit 21), he would have been entitled to 8 hours a day during the business week of free USDA inspections and if he did not want the inspection for all his meat products, he could have had inspected only those items that were cured, cooked, and smoked and therefore required USDA inspection and intended for sale to HRI [hotel, restaurant, and institution] like the Roadhouse. But it may be hard to convince someone like Mr. Bucheli to apply for free USDA inspections, if he can't be convince[d] that he was otherwise violating federal meat inspection laws and regulations.

8. Assuming that Mr. Bucheli appropriately labeled his meat products for sale to the Roadhouse, as an exempt retail butcher, he still was limited in the quantity of meat products that would be available for sale to the Roadhouse. The regulations require that at least 75 [percent] of an exempt retail brokers meat sales based on total dollar value have to go to "household consumers," which means Mr. Bucheli could sell no more than 25 [percent] of his total sales to the Roadhouse. There is also a maximum

annual cap on the amount a retail exempt butcher [can] legally sell to HRI, but in 2007 that cap for meat products to HRI was $55,100 but my understanding Mr. Bucheli's total meat sales have been far below the annual maximum caps. The maximum caps apply to the 25 [percent] available to HRI. In other words, he could sell no more than 25 [percent] of total sales to HRI but no more than the annual cap. Mr. Bucheli is required to have kept records of his total meat sales and make them available for USDA inspection in order to show that he was in compliance with the 75/25 [percent] division of sales based on total sales volumes. According to his deposition, his total meat sales reflected turkey sales as well. Meat and poultry products are separately defined and are subject to their own separate regulations. Stating that his turkey sales are mixed up with his meat sales violates USDA record keeping requirements.

9. Regardless of what Mr. Bucheli believes or understands the law to be, there is no permissible circumstance that would make it legal for him to sell meat products to the Roadhouse without product and safe handling labels and without the necessary product information whether in 2007 or in 2015. It would be illegal for the Roadhouse to sell knowingly such unlabeled meat ("misbranded") to its customers.

CP at 261-64.

In a declaration in opposition to the tenants' summary judgment motion, Alfred Bucheli declared that the Roadhouse Grill did not complain about the lack of USDA labeling until 2011. Before that year, the Roadhouse Grill asserted other excuses to avoid purchasing Matterhorn Meats meat, including undesirable cuts and quality.

The superior court granted the tenants' summary judgment motion. The trial court ruled that Roadhouse LLC breached the lease agreement by failing to pay more for the inventory, but that the breach was not material. The trial court ordered Roadhouse Grill Inc. to pay for the inventory. The court directed Alfred Bucheli to sell the property and restaurant to Roadhouse Grill Inc. and directed Bucheli to pay the tenants' reasonable

24

attorney fees and costs. The court dismissed Bucheli's counterclaims. Bucheli paid the attorney fees and transferred the property to Roadhouse Grill Inc. in compliance with the order and judgment. Roadhouse Grill Inc. tendered full payment of the inventory, plus 12 percent interest to Bucheli.

Alfred Bucheli appeals the grant of summary judgment in favor of his tenants, the dismissal of his counterclaims, and the award of attorney fees to the tenants.

## LAW AND ANALYSIS

Alfred Bucheli contends the trial court erred in granting summary judgment for his tenants because of a genuine issue of material fact as to whether the parties both mistakenly believed that, at the time of entering the lease, he could sell meat to the restaurant. Therefore, according to Bucheli, he was entitled to a trial as to whether he presented a case for mutual mistake and, in turn, whether he was entitled to rescission or reformation of the lease. Bucheli does not enlighten us as to how a court should or could rescind the lease after the parties have performed under the lease for nine years. He does not identify for us how the lease should read upon reformation. Alfred Bucheli also argues that the trial court erred in granting specific performance of the option to purchase because a material fact existed as to whether the tenants materially breached the lease by not purchasing meat from him and by failing to pay for inventory.

The tenants contend that the lease was enforceable and that Roadhouse Grill had no obligation to purchase meat from Alfred Bucheli because of the illegality of any sale

of meat. The tenants argue that Alfred Bucheli cannot, as a matter of law, prove the

elements of mutual mistake and that Bucheli bore the risk of the mistake. The tenants

argue that there is no issue of material fact as to Roadhouse Grill Inc.'s right to exercise

the option to purchase the property because it was not in breach of the obligation to

purchase meat from Bucheli and the unpaid portion of the inventory was not material to

the transaction.

This court reviews a summary judgment order de novo, engaging in the same

inquiry as the trial court. *Columbia Community Bank v. Newman Park, LLC*, 177 Wn.2d

566, 573, 304 P.3d 472 (2013). Summary judgment is proper if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law. CR 56(c); *Munich v. Skagit

Emergency Communication Center*, 175 Wn.2d 871, 877, 288 P.3d 328 (2012). An

appellate court may affirm the trial court's decision on any ground supported by the

record. *Allstot v. Edwards*, 116 Wn. App. 424, 430, 65 P.3d 696 (2003). This court

construes all facts and reasonable inferences in the light most favorable to the nonmoving

party. *Loeffelholz v. University of Washington*, 175 Wn.2d 264, 271, 285 P.3d 854

(2012).

## Mutual Mistake

Facts show that Alfred Bucheli and Roadhouse LLC expected that Roadhouse

Grill would purchase meat products from Bucheli or pay a 20 percent surcharge on meat purchased from another source. Bucheli told the limited liability company's agent, James Rowe, that Bucheli would lease the building to Roadhouse LLC only if Roadhouse Grill bought meat from Bucheli. Paragraph 5 of the lease confirmed this understanding and imposed this obligation on Roadhouse. We must decide the ramifications of this expectation when confronted with the reality that Bucheli unlawfully sold meat to Roadhouse Grill because the meat was not labeled and some of the meat needed, but did not receive, USDA inspection.

On appeal, Alfred Bucheli contends material factual issues exist regarding whether Roadhouse LLC and he entered the lease with a mistaken belief as to the amount and the type of meat that Roadhouse Grill could or would purchase from Bucheli for the restaurant. According to Bucheli, when the parties entered into the lease, the two believed that nothing prevented Roadhouse Grill from buying any of the restaurant's meat needs. Bucheli further postulates that the parties were unaware of any USDA regulations that impacted their agreement. According to Bucheli, the parties' belief that Roadhouse Grill could legally purchase its meat from Bucheli in the same manner in which he had supplied the Matterhorn Restaurant with meat was a basic assumption of the lease.

Mistake may be unilateral or mutual, with different rules attaching to each category of mistake. Alfred Bucheli argues only mutual mistake. Washington follows

27

the doctrine of mutual mistake as iterated in *Restatement (Second) of Contracts* (Am. Law Inst. 1981). *Denaxas v. Sandstone Court of Bellevue, LLC*, 148 Wn.2d 654, 668-69, 63 P.3d 125 (2003); *Simonson v. Fendell*, 101 Wn.2d 88, 91-92, 675 P.2d 1218 (1984).

Under *Restatement (Second) of Contracts* principles adopted by Washington courts, when the parties made a mistake, at the time of executing a contract, as to a basic assumption on which the contract was made, and the mistake has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake. RESTATEMENT § 152. Stated differently, a party may void or reform a contract if both parties mistakenly believed in the truth of a particular basic assumption and that assumption was material to the contract. This statement of the rule appears redundant because, if the assumption was basic to the contract, one might readily conclude that the assumption was material.

An initial question for analyzing a claim of mutual mistake is to ask whether both parties mistakenly believed the truth of a particular fact. A mistake is a belief that is not in accord with the facts. RESTATEMENT § 151. Thus, we must identify the fact or facts on which Alfred Bucheli claims the parties mistakenly believed. Bucheli blurs together two distinct facts: (1) that he could and would sell meat to Roadhouse Grill, and (2) that he could sell meat to Roadhouse Grill without the need of labeling or inspection by the USDA. We analyze each fact separately.

Concerning the first fact, we agree that the parties understood that Bucheli would

sell meat to Roadhouse Grill. We conclude, however, there was no mistaken belief regarding this fact. Nothing prevented Bucheli from delivering meat for use in the restaurant. Bucheli could sell to Roadhouse Grill provided he labeled all meat and allowed inspection of cured, cooked, and smoked meat. Once the Roadhouse Grill complained that Bucheli violated the law, Bucheli could have continued to sell meat to the Roadhouse Grill if he complied with the law by labeling all meat and permitting inspection of some of the meat.

Alfred Bucheli has presented no evidence that he could not comply with federal law without significant expense. Robert Leifert, the former USDA compliance investigator, declared that Bucheli was entitled to free inspections eight hours a day on business days. Bucheli presented no countervailing testimony and no testimony that he would need more inspections than the free inspections afforded him. Bucheli presented no testimony of the cost of a labeling machine or the time needed to label the meat. Bucheli provided no testimony that his cured and smoked meat would not pass inspection. Thus, we are left with the conclusion that Bucheli could have complied with the law at nominal expense and thereby continued to supply meat to Roadhouse Grill.

The test for mutuality of mistake requires the mistaken fact be the underlying basis of the entire agreement and, when discovered, that the essence of the agreement is destroyed. *Seattle Professional Engineering Employees Association v. Boeing Co.*, 139 Wn.2d 824, 832, 991 P.2d 1126 (2000); *Childers v. Alexander*, 18 Wn. App. 706, 709,

571 P.2d 591 (1977). The essence of the 2007 lease was not destroyed because Alfred

Bucheli, despite USDA regulations, could continue to sell meat to Roadhouse Grill

without added expense. Bucheli does not allege commercial frustration or impossibility

of performance.

The parties agree that, at least for purposes of the summary judgment motion, the

law, at the time they entered the lease, required Bucheli to label all meat sold and to

allow inspection of certain meat sold to the tenants. The second assumed fact forwarded

by Alfred Bucheli to support his counterclaim of mutual mistake is that the parties, at the

time of executing the lease, mistakenly thought that he need not label or permit

inspection of meat. We agree that facts show that, at the time of contracting, Alfred

Bucheli mistakenly believed he could legally sell without labeling or inspection. We

agree further with Bucheli that the law in existence at the time of the making of the

contract is part of the total state of facts at that time. RESTATEMENT § 151 cmt. b. A

party's erroneous belief with respect to the law, as found in statute, regulation, judicial

decision, or elsewhere, or with respect to the legal consequences of his acts, may

therefore come within the rules of mistake. RESTATEMENT § 151 cmt. b.

Alfred Bucheli's claim of mutual mistake fails, however, because he presents no

evidence that James Rowe or any other agent of Roadhouse LLC shared his mistake. The

facts do not show that Rowe believed, at the time of entry of the lease, that Bucheli could

sell unlabeled meat or cured or cooked meat without a USDA inspection. Upon entry of

30

the lease agreement, James and Shannon Rowe lacked knowledge that the USDA did not inspect Alfred Bucheli's butcher shop or that the USDA imposed "substantial restrictions" on Bucheli's sale of meat. We assume, however, that the Rowes never contemplated whether or not USDA regulations applied, and, if so, what regulations. Alfred Bucheli told James Rowe that he wanted to sell meat to the restaurant, but Bucheli never told Rowe that the meat would be unlabeled or uninspected. Bucheli never informed Rowe that Bucheli believed he was exempt from any labeling or inspection requirements.

A party seeking to rescind an agreement on the basis of mutual mistake must show by clear, cogent and convincing evidence that the mistake was independently made by both parties. *Chemical Bank v. Washington Public Power Supply System*, 102 Wn.2d 874, 898-99, 691 P.2d 524 (1984); *Paopao v. Department of Social & Health Services*, 145 Wn. App. 40, 50, 185 P.3d 640 (2008). To repeat, Alfred Bucheli forwarded no evidence, to defeat a summary judgment motion, that Roadhouse LLC shared in his belief that he could sell without labeling or USDA inspection.

The tenants also argue that Alfred Bucheli may not reform or void the 2007 lease because Bucheli assumed the risk that his selling practices did not conform to the law. A party bears the risk of a mistake when (a) the risk is allocated to him by agreement of the parties, (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited

knowledge as sufficient, or (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so. *Public Utility District No. 1 of Lewis County v. Washington Public Power Supply System*, 104 Wn.2d 353, 362 705 P.2d 1195 (1985); RESTATEMENT § 154. We do not address whether Bucheli assumed any risk, since we hold that Bucheli has forwarded no facts to support the parties suffered from the same mistake of fact.

Enforceability of Purchase Option

Paragraph 23 of the lease agreement allowed the tenant to purchase the restaurant property provided the tenant was "not in default." CP at 31. Alfred Bucheli contends the trial court erred when granting Roadhouse Grill Inc. an order compelling Bucheli to sell the property because questions of fact existed as to whether the tenants were in default.

A default is the omission or failure to perform a contractual duty. *Black's Law Dictionary* 507 (10th ed. 2014). Any failure to perform a contractual duty when the time for performance has accrued constitutes a breach. RESTATEMENT § 235 (1981). If a party breaches, the aggrieved party's contractual duties will only be discharged if the breach was so material as to justify a refusal to perform. *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 179 Wn. App. 205, 220, 317 P.3d 543 (2014); *Jacks v. Blazer*, 39 Wn.2d 277, 285-86, 235 P.2d 187 (1951).

When a party breaches, a court must therefore determine if the breach was material. *Jacks v. Blazer*, 39 Wn.2d at 285-86. In determining whether a breach is

32

material, the following circumstances are significant:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

RESTATEMENT § 241 (1981); *Bailie Communications, Ltd. v. Trend Business Systems*, 53 Wn. App. 77, 83, 765 P.2d 339 (1988).

Alfred Bucheli first argues that Roadhouse Grill's failure to purchase meat from his butcher shop in accordance with the lease constituted a material breach, placing tenants in default of the lease, and discharging Bucheli's duty to sell the restaurant to them. Paragraph 5 of the lease required the tenants to purchase meat products from Bucheli so long as "they are available" through Bucheli or the tenants would pay a twenty percent surcharge. CP at 22.

A condition is an event, not certain to occur, which must occur before performance under a contract becomes due. RESTATEMENT § 224 (1981); *Chemical Bank v. Washington Public Power Supply System*, 102 Wn.2d at 897 (1984). The tenants incurred the responsibility of purchasing meat from Alfred Bucheli on the condition that meat was available to buy.

33

Under USDA regulations, and as a matter of law, Alfred Bucheli could not sell unlabeled meat to Roadhouse. He could not sell smoked or cured meat without a USDA inspection. Because he could not lawfully sell the meat, the meat was not available from Bucheli, and the tenants did not breach the lease agreement by refusing to purchase the product.

Alfred Bucheli next argues that the tenants' failure to pay $4,083.31 for the inventory was a material breach. Roadhouse contends that, even if there is a breach, the difference of $2,556.56 is not material on a transaction for $1,377,740.00.

Exhibit B of the lease agreement demanded that the tenant purchase the restaurant's inventory accepted by the tenant as useful at cost. Alfred Bucheli testified that all inventory was useable. In their depositions, James and Shannon Rowe declared that only $1,526.75 was useable. Taking these facts in the light most favorable to Bucheli, we assume a factual issue as to whether the inventory was useable and a breach by the tenants. Nevertheless, the trial court resolved the issue of breach by requiring Roadhouse to pay Bucheli for the inventory in the amount of $2,556.56 plus interest at twelve percent.

Despite the existence of a breach, the contract and its option to purchase the restaurant premises remained enforceable because the breach was not material to the transaction. The breach only deprived Alfred Bucheli of $2,556.56 on a transaction of $1,377,740.00. Bucheli has now been paid the sum plus interest thereon at a high rate.

34

Roadhouse Grill Inc. would suffer a massive forfeiture if they could not purchase the property. There is no issue of material fact here. Regardless of whether there was a breach, the breach was immaterial.

Reasonable Attorney Fees and Costs

Alfred Bucheli argues that the trial court erred in awarding attorney fees and costs to Roadhouse because they should not have been the prevailing party. We affirm the trial court's rulings so the tenants remain the prevailing party before the trial court.

RCW 4.84.330 provides that a prevailing party is entitled to attorney fees if the contract that is the subject of the action authorizes such an award. *Marine Enterprises, Inc. v. Security Pacific Trading Corp.*, 50 Wn. App. 768, 772, 750 P.2d 1290 (1988). Paragraph 18 of the lease contract between the parties demanded that the losing party pay the prevailing party's reasonable attorney fees and costs.

We also award the tenants reasonable attorney fees and costs incurred on appeal in an amount to be determined by our court commissioner. The tenants complied with the procedural steps of RAP 18.1 for such an award.

CONCLUSIONS

We affirm all rulings of the superior court. We grant the tenants reasonable attorney fees and costs on appeal.

No. 33719-7-III
*Wing Central's Roadhouse Grill Inc. v. Bucheli*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____    _____
Korsmo, J.    Siddoway, J.

36